1
2
3
4
5
6
7          **UNITED STATES DISTRICT COURT**
8          **EASTERN DISTRICT OF CALIFORNIA**
9

10   **JOSHUA TAYLOR,**                          **CASE NO. 1:13-CV-1019 AWI MJS**

11                        **Plaintiff**

12                **v.**                          **ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

13   **TREES, INC.,**

14                        **Defendant**           (Doc. No. 39)

15

16

17          This is an employment discrimination case brought by Joshua Taylor ("Taylor") against

18   his former employer, Trees, Inc. ("Trees").  The active complaint is the First Amended Complaint

19   ("FAC").  Taylor alleges four disability related causes of action under the California Fair

20   Employment and Housing Act (Government Code § 12900 et. seq.) ("FEHA"), one cause of

21   action for violation of the California Family Rights Act (Government Code § 12945.2) ("CFRA"),

22   and one cause of action for violation of the federal Family Medical Leave Act (29 U.S.C. § 2601

23   *et. seq.*) ("FMLA").  Trees now moves for summary judgment on Taylor's failure to accommodate

24   (FEHA § 12940(m)) and failure to engage in an interactive process (FEHA § 12940(n)) causes of

25   action.  Trees also moves for summary judgment regarding the issues of Taylor's mitigation of

26   damages, the availability of emotional distress damages, and punitive damages.  For the reasons

27   that follow, Tree's motion will be granted in part and denied in part.

28

## SUMMARY JUDGMENT FRAMEWORK

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." Fed. R. Civ. Pro. 56(a).  A motion for partial summary judgment, also known as summary adjudication, is resolved under the same standards as a motion for summary judgment. See Kirbyson v. Tesoro Ref. & Mktg. Co., 795 F.Supp.2d 930, 938 (N.D. 2011); Synbiotics Corp. v. Heska Corp., 137 F.Supp.2d 1198, 1202 (S.D. Cal. 2000).

Summary judgment is proper when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce

1    anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan

2    Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party

3    meets its initial burden, the burden then shifts to the opposing party to establish that a genuine

4    issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio

5    Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest

6    upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets

7    forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope

8    Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

9         The opposing party's evidence is to be believed, and all justifiable inferences that may be

10   drawn from the facts placed before the court must be drawn in favor of the opposing party.  See

11   Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

12   (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive

13   inference, a "justifiable inference" must still be rational or reasonable.  See Narayan, 616 F.3d at

14   899.  "If conflicting inferences may be drawn from the facts, the case must go to the jury." Holly

15   D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003).  Inferences are not drawn out of the

16   air, and it is the opposing party's obligation to produce a factual predicate from which the

17   inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal.

18   2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine

19   issue of material fact does not spring into being simply because a litigant claims that one exists or

20   promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d

21   15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir.

22   2002).  The parties have the obligation to particularly identify material facts, and the court is not

23   required to scour the record in search of a genuine disputed material fact.  Simmons v. Navajo

24   Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).  Further, a "motion for summary judgment may not be

25   defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson,

26   477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the

27   nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the

28   moving party is entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

# FACTUAL BACKGROUND[1]

Trees performs line clearance tree trimming and vegetation control for various utility companies and government districts.  DUMF 1.  Taylor was hired by Trees as a Groundsman in March 2011, and was later promoted to a Tree Trimmer 1/Climber I, and then a Tree Trimmer 2/Climber II.  See PUMF 1; Taylor Depo. 21:2-9; Colis Dec. ¶ 8.  When Taylor was hired, he became a member of a union, IBEW Local 1245.  See DUMF 3; PUMF 2.

On September 24, 2012, Taylor complained to his foreman that his back was "really tightening up" while he was climbing a palm tree at work.  PUMF 96.  At 3:00 a.m. on September 30, 2012, Taylor awoke in pain from an injury to his neck and back, which disabled him from work.  See PUMF 97.

On October 1, 2012, Taylor called general foreman Ronnie Colis ("Colis") to inform Colis that he was in a lot of pain and did not know what was wrong.  See PUMF 99.  Colis responded that Taylor should let him know how he felt the next day.  See id.  That day, Colis informed Kevin Agpalo, a foreman with Trees, that Taylor had an injury that was disabling Taylor from work.  See PUMF 100.  The next day, Taylor called Colis and informed him that he was still in pain.  PUMF 101.

During the week of October 1, Taylor communicated with Colis and Agpalo about his injury.  PUMF 102.  Either Colis or Agpalo told Taylor that an FMLA packet would be brought to his house and that Taylor should look into FMLA leave because it would protect his job for 90 days.  Id.  Trees dropped off FMLA paperwork to Taylor's house.  PUMF 103.  Among the documents Taylor received were an application, an FMLA sign-off form, and a healthcare provider certification form.  See DUMF 6.  Taylor completed portions of the forms, and gave the packet to his physician, Dr. Roth, to complete.  See id.; PUMF 107.  The medical certification form was completed and forwarded to Trees.  DUMF 7.  Taylor understood that he was on an approved leave of absence under the FMLA.  DUMF 8.

On November 16, 2012, Taylor received a release to return to work ("the November

---

[1] "DUMF" refers to "Defendant's Undisputed Material Fact," and "PUMF" refers to "Plaintiff's Undisputed Material Fact."  Additionally, there have been various objections made to the submitted exhibits and evidence.  Unless specifically addressed by the Court, all objections are deemed overruled for purposes of this order.

4

Release") with restrictions from Dr. Roth.  <u>See</u> DUMF 19.  The same day, Taylor took the release

and gave it to Agpalo.  <u>See</u> PUMF 126.  The November Release indicated that Taylor could return

to work on November 19, 2012, and included restrictions such as "must use two hands, no heavy

saws, if any symptoms/weakness, must stop."  <u>Id.</u>; PUMF 125.  Taylor understood the November

Release imposed a "no climbing" restriction because tree trimmers/climbers had to have

chainsaws with them when they were in a tree, and there was "no job description that says go

climb a tree and don't do any work."  <u>See</u> DUMF's 10, 11.  Taylor agreed that there were some

aspects of his job that he could not perform with the restrictions set forth in the November

Release.  DUMF 12.[2]  Shortly thereafter, Agpalo informed Colis of the November Release,

including the restrictions imposed.  <u>See</u> DUMF 14.  Based on the note, Colis had "concerns not

only for his own safety but the safety of other people on the job."  Colis Depo. 213:16-25.[3]

On November 19, 2012, Taylor received a phone call from Agpalo.  <u>See</u> PUMF 131.

Agpalo stated that he was sorry, he could not put Taylor back to work, and he was told that he

could not put Taylor back to work unless Taylor was "100 percent."  <u>Id.</u>  Agpalo told Taylor that

the decision was for safety, "for you and for us."  DUMF 17.  Agpalo did not say anything about

getting a medical extension to extend Taylor's leave.  PUMF 132.  Although it does not appear

that Dr. Roth was actually consulted by Trees, Dr. Roth concurred that there were safety issues to

consider in terms of Taylor returning to work in November 2012.  <u>See</u> DUMF 18.

From November 19, 2012 through November 30, 2012, Taylor did not have contact with

Trees because Agpalo made it clear that Taylor could not work until he was 100%, and Agpalo

---

[2] Taylor objects to DUMF 12 by arguing that there is a lack of foundation, it assumes facts not in evidence, it is vague and ambiguous about what "job" was being referenced and what the "essential functions" are for each job.  Taylor also denies this DUMF by reference to two pages in his deposition.  Despite Taylor's response and objections, DUMF 12 is not genuinely disputed.  Taylor was a Climber II.  When Taylor was asked about his "job" in relation to the November Release, there is absolutely no reason to think that Taylor was referring to anything other than a Climber II.  As a Climber II, Taylor would have an understanding of the essential functions of that position.  The two cited deposition pages deal with the duties of a Groundsman.  Because Taylor was a Climber II and not a Groundsman at the time of his injury, the deposition pages are irrelevant to DUMF 25.  Taylor's objections are overruled.

[3] There is a genuine dispute about whether Colis talked to Taylor about the November Release.  Colis testified that he called and spoke to Taylor, and that Taylor elaborated on the symptoms he was experiencing.  <u>See</u> Colis Depo. 187:20-190:16.  Taylor denies that Colis ever discussed the November Release with him.  <u>See</u> Taylor Depo. 79:18-83:6.  Because Taylor is the non-moving party, his version of events is credited.  <u>See</u> <u>Narayan</u>, 616 F.3d at 899.  Therefore, for purposes of this motion, Colis did not speak to Taylor about the November Release.

1   was busy taking over Colis's duties and did not want to be bothered.  See PUMF 133.  From

2   December 1 through December 23, 2012, Taylor left 1 voice-mail message on Colis's phone and 1

3   voice-mail message on Agpalo phone.  See Taylor Depo. 90:12-21.  Taylor's messages asked what

4   was up and that he had not heard from them in a while.  See id. at 91:12-19.

5          On December 24, 2012, Taylor left a voice mail with Colis.  See PUMF 135.  Taylor

6   wished Colis "Merry Christmas," indicated that he had an appointment on January 8 where he

7   expected to be released back to work with full duties, and that he was looking forward to getting

8   back to work.  See id.  Taylor left the message because he felt strong and healthy enough to go

9   back to work with full duties, and believed that his doctor would release him to work.  See PUMF

10  136.

11         From December 25, 2012 to January 7, 2013, Taylor did not have contact with Colis or

12  Agpalo.  PUMF 137.  On January 7, 2013, Taylor's physical therapist informed Dr. Roth that

13  Taylor had progressed and was ready to return to work.  PUMF 139.  Taylor felt 100% ready to

14  return to normal activity/work without any pain or discomfort.  PUMF 140.

15         On January 8, 2013, Taylor received a full release to work with no restrictions from Dr.

16  Roth.  See PUMF 141.  The same day, Taylor drove to the state disability office to cut off his

17  disability, and then took the release to Agpalo.  See PUMF's 141, 142; DUMF 25.  Agpalo told

18  Taylor that he would pass the return to work notice to Terry Colis (who mails return to work

19  notices to the appropriate Trees corporate office, see PUMF 143), and that he would call Taylor

20  regarding the "next step," which was taking a drug test.  PUMF 144.

21         Agpalo later contacted Taylor and told him to come to the office to talk.  See PUMF 145.

22  Taylor immediately drove to the Trees office.  See PMF 146.  Agpalo told Taylor that Taylor was

23  terminated because he had gone over the days allowed by his doctor's release, and that Taylor

24  should contact the union.  See PUMF 155.  Agpalo did not review or consult any documents prior

25  to terminating Taylor, and it was not Agpalo's choice to terminate Taylor.  See PUMF's 151-153.

26  Agpalo found out that Taylor was terminated by either Colis or Terry Colis in January 2013.

27  PUMF 149.  Colis testified that he decided to terminate Taylor's employment sometime before

28  January 8, 2013 because Taylor exceeded the allotted FMLA leave without approval.  See Doc.

No. 46 at 4:22-24; DUMF 24;[4] Colis Dec. ¶ 5.  Taylor filed for unemployment in January 2013.

On February 1, 2013, an agent of Trees sent a letter to the California Employment Development Department.  PUMF 158.  The letter stated in pertinent part, "[Taylor] is currently on approved leave of absence.  The claimant had an off the job injury.  He has not made any contact with his employer.  We wish to question their eligibility for work."  Id.

On February 25, 2013, Trees's Human Resources Department in Willow Grove, Pennsylvania began reviewing Taylor's FMLA application.  See PUMF 160.  The next day, Colis informed Human Resources that Taylor was never going to be 100% due to a back injury, and that Colis was not in a position to hire employees.  See PUMF 161.

On February 27, 2013, a letter was sent to Taylor from Trees that certified his leave expired on November 30, 2012.  See PUMF 163.  The reason for the delay in sending the letter was that Human Resources employees were overwhelmed with too many FMLA files, and Taylor's case was not calendared for follow up until after the date he was due to return from FMLA leave.  PUMF 166.

In August 2013, Taylor received one voice mail from Agpalo and two voice mail messages from Colis.  See Taylor Dec. ¶ 9.  The messages were to offer Taylor a position as a Trimmer/Climber with Trees.  See Colis Dec. ¶ 8.  The messages encouraged Taylor to apply for a position with Trees.  See Plaintiff's Ex. M at 15:15-18.  The messages never made reference to an "unconditional offer," nor did the messages specify what position was being offered.  Taylor Dec. ¶ 9.  Taylor did not return Agpalo's or Colis's messages, and never had a conversation with Agpalo or Colis about returning to work with Trees.[5]  See PUMF's 173, 174.  Taylor will not accept a job with Trees because he believes that Trees would retaliate against him for filing this lawsuit, and he does not want the fear of retaliation to affect him while working around power lines in trees.  See PUMF's 175, 176.

---

[4] Taylor disputes DUMF 24.  See Doc. No. 47 at p.7.  However, as part of the "Facts" section in his opposition, Taylor utilizes the substance of DUMF 24, with the preference that Colis "testified" to the reason for firing.  See Doc. No. 46 at 4:22-24.  For purposes of this motion, the Court will utilize the substance of DUMF 24 as it appears in Taylor's opposition.

[5] The Court notes that there is a genuine dispute on the issue of whether Colis actually spoke to Taylor.  However, as the non-moving party, Taylor's version of events is credited.  See Narayan, 616 F.3d at 899.

1

**DEFENDANT'S MOTION**

2

**1.**      **Mitigation of Damages**

3

*Defendant's Arguments*

4

Trees argues that Taylor is not entitled to back pay beyond August 2013.  In August 2013,

5

Trees argues that Agpalo and Colis made Taylor an unconditional offer of reemployment to his

6

old position, with prior seniority.  Had Taylor accepted the offer, he would not have accumulated

7

further economic damages.  Since there were no "special circumstances" that justified Taylor's

8

refusal to accept the position with Trees, Taylor is not entitled to back-pay from August 2013

9

forward.

10

*Plaintiff's Opposition*

11

Taylor argues *inter alia* that no unconditional offer of reemployment was made to him.

12

None of the evidence cited by Trees indicates that an unconditional offer was made, and Trees's

13

verified interrogatory responses indicate that Taylor was encouraged to apply for a position, which

14

contradicts Colis's declaration regarding the job offer.  Taylor also argues that his declaration

15

shows that he never spoke to Colis, and that the voice-mail messages neither identified what job

16

was involved nor stated that an unconditional offer was being made.

17

*Legal Standard*

18

"Under California law, an employee who has been wrongfully terminated has a duty to

19

mitigate damages through reasonable efforts to achieve other employment."  Boehm v. American

20

Broadcasting Co., 929 F.2d 482, 485 (9th Cir. 1991); see Parker v. Twentieth Century-Fox Film

21

Corp., 3 Cal. 3d 176, 181 (1970); Villacorta v. Cemex Cement, Inc., 221 Cal.App.4th 1425, 1432

22

(2013).  A failure to "accept offers of employment is significant in consideration of mitigation

23

only if the former employer shows 'that the other employment was comparable, or substantially

24

similar, to that of which the employee has been deprived.'"  Boehm, 929 F.2d at 485; Parker, 3

25

Cal. 3d at 182; Villacorta, 221 Cal.App.4th at 1432.  The United States Supreme Court has held

26

that, absent "special circumstances," backpay liability ceases to accrue at the time the plaintiff

27

rejects the employer's unconditional offer of either the same job as, or one "substantially

28

equivalent" to, the job from which the claim arose.  Ford Motor Co. v. EEOC, 458 U.S. 219, 231-

33, 241 (1982); Boehm, 929 F.2d at 485; Moreno v. ANWA Hotel & Resort Int'l, Inc., 2006 Cal.App. Unpub. LEXIS 7714, *16-*18 (Aug. 29, 2006).[6]  The rule of *Ford Motor* has been applied to California law employment causes of action.  See Boehm, 929 F.2d at 485-87; Moreno, 2006 Cal.App. Unpub. LEXIS 7714 at *15-*19.  Pursuant to *Ford Motor*, the defendant employer must establish that the plaintiff failed to accept an unconditional offer to the lost job or a job substantially equivalent to the one lost, and it is "only when the employer carries this initial burden that the plaintiff must establish 'special circumstances' justifying a rejection of the offer." Boehm, 929 F.2d at 485; see Moreno, 2006 Cal.App. Unpub. 7714 at *18-*21.

*Discussion*

Trees submitted DUMF 27, which states that it "unconditionally offered to return Taylor" to his old job.  See DUMF 27.  However, as Taylor rightly points out, none of the evidence cited by Trees actually states that an "unconditional offer" was made to Taylor.  The deposition testimony of Colis merely indicates that he "reached out" to Taylor to fill a position, and Colis's declaration merely indicates that he offered a position to Taylor.  See Colis Depo. 240:11-242:12; Colis Dec. ¶ 8.  In contrast, Taylor has declared that he did not speak to Agpalo or Colis in August 2013, that the messages did not identify what job was actually available, and that the word "unconditional" was not used.  See Taylor Dec. ¶ 9.  Importantly, Trees's verified interrogatory response stated that the voice-mail messages encouraged Taylor to apply for a position.  See Plaintiff's Ex. M at 15:15-18.  Encouraging one to apply for an unidentified job is hardly the same as unconditionally offering a specific job to a person.  If one applies for a job, there is no guarantee of actual employment.  An application merely permits the applicant to be considered by the employer for the job.  With an "unconditional offer," there are no other considerations or contingencies.  Once the offer is accepted, the position is filled and a contract is formed.  Viewed in the light most favorable to Taylor and making all reasonable inferences in his favor, see Narayan, 616 F.3d at 899, by encouraging Taylor to submit an application, the sense is that Trees was encouraging Taylor to submit himself for consideration; the sense is not that Taylor simply

---

[6] Despite state rules, the Court may consider unpublished state cases as persuasive authority.  See Employers Ins. of Wausau v. Granite State Ins. Co., 330 F.3d 1214, 1220 n.8 (9th Cir. 2003); Altman v. HO Sports, 821 F.Supp.2d 1178, 1189 n.4 (E.D. Cal. 2011).

1   had to accept the job and it would be his.[7]

2       In sum, the evidence does not show that Trees made an "unconditional offer" to reemploy

3   Taylor at the same position or a substantially similar position.  Without such an "unconditional

4   offer," the rule in *Ford Motor* has no application.  See Boehm, 929 F.2d at 485; Moreno, 2006

5   Cal.App. Unpub. 7714 at *18-*21.  Summary judgment on this issue is inappropriate.

6

7   **2.**     **Emotional Distress Damages**

8       *Parties' Arguments*

9       Trees argues that, as part of the discovery process in this case, Taylor declared that he was

10  withdrawing any allegation of enhanced emotional distress and was seeking only "garden variety"

11  emotional distress arising from his termination.  In order to recover for emotional distress, the

12  injuries suffered must be severe and enduring.  Taylor's declaration negates an essential element

13  of emotional distress damages.  Therefore, Taylor cannot recover for emotional distress.

14       Taylor argues *inter alia* that the pursuit of garden variety emotional distress is appropriate.

15  Garden variety emotional distress such as embarrassment, anger, or other similar emotions may be

16  recovered if they are incident to Trees's wrongful conduct.

17       *Discussion*

18       Under California law, employment discrimination can cause emotional distress, and

19  recovery for such emotional distress may be included as compensatory damages.  See Peralta

20  Community College Dist. v. Fair Employment & Housing Com., 52 Cal.3d 40, 48 (1990).  The

21  term "emotional distress" refers to "the full gamut of intangible mental suffering, including not

22  only physical pain, but also fright, nervousness, grief, anxiety, worry, mortification, shock,

23  humiliation, embarrassment, apprehension, terror, or ordeal."  Id. at n.4; see Capelouto v. Kaiser

24  Foundation Hospitals, 7 Cal.3d 889, 892-93 (1972); Crisci v. The Security Ins. Co., 66 Cal.2d 425,

25

26  [7] In reply, Trees argues that because Taylor had been "formally separated," it stands to reason that Taylor would have
     to reapply, the application was simply a matter of paperwork, and Taylor cites no authority for the proposition that
27  requiring an employee to complete standard paperwork is not an unconditional offer.  The Court disagrees.  It does not
     necessarily stand to reason that Taylor would have to reapply.  In fact, the requirement of submitting an application
     seems contrary to an "unconditional offer."  Trees cites no authority for the proposition that encouraging an employee
28  to reapply is essentially an "unconditional offer,"  and cites no evidence that explains that the application would be
     only "standard paperwork" or a mere formality.

1   433 (1967); <u>see also</u> Judicial Council of Cal., Civil Jury Instructions ("CACI") § 3905A.

2   California law is settled that "emotional distress" constitutes "an aggravation of damages when it

3   naturally ensues from the act complained of . . . ." <u>Crisci</u>, 66 Cal.2d at 433; <u>see</u> <u>Capelouto</u>, 7

4   Cal.3d at 892.  To recover for such damages, there is no requirement that the "emotional distress"

5   be severe.  <u>See</u> CACI §§ VF 2509, VF 2514, VF 2513, VF 2600, 3905A; <u>cf.</u> <u>Capelouto</u>, 7 Cal.3d

6   at 893 (discussing "naturally ensuing mental suffering" and not requiring that such suffering be

7   "severe"); <u>Crisci</u>, 66 Cal.2d at 433 (same).

8           Trees cites no cases that require the emotional distress suffered from a violation of FEHA

9   or CFRA to be "severe" in order to be part of compensatory damages.  Because there is no

10   requirement under California law that Taylor demonstrate severity in order to recover as

11   compensatory damages the emotional distress that ensued from Trees's alleged violations of

12   FEHA and the CFRA,[8] summary judgment regarding FEHA and the CFRA is inappropriate.

13          However, the FAC alleges that Taylor also suffered emotional distress damages as a result

14   of Trees's violation of the FMLA.  <u>See</u> FAC ¶ 38.  Under the FMLA, damages for emotional

15   distress are not recoverable.  <u>See</u> <u>Jackson v. City of Hot Springs</u>, 751 F.3d 855, 865 (8th Cir.

16   2014); <u>Farrell v. Tri-County Metro. Transp. Dist.</u>, 530 F.3d 1023, 1025 (9th Cir. 2008).  Partial

17   summary judgment in favor of Trees on the issue of emotional distress damages under the FMLA

18   is appropriate.  <u>See</u> <u>id.</u>

19

20   **3.**     **Punitive Damages**

21          *Defendant's Argument*

22          Trees argues that Taylor is not entitled to punitive damages under Civil Code § 3294(b)

23   because a managing agent was not involved in any of the allegedly improper conduct.  Colis was

24   the sole decision maker with respect to Taylor's termination and the decision not to permit Taylor

25   to return to work under the November Release.  Colis was a general foreman and was not a policy

26   maker.  Colis had no authority over Trees's guiding principles or the rules that governed Trees's

27

28   ────────────
[8] The Court emphasizes that it is discussing only emotional distress *damages*, as opposed to the tort of intentional infliction of emotional distress.  Under the cause of action for intentional infliction of emotional distress, the emotional distress suffered must be severe.  <u>See</u> CACI §§ 1601, 1604.

1    operation.  Further, Colis's conduct was not authorized or ratified by anyone else at Trees.

2    _Plaintiff's Opposition_

3    Taylor argues that summary judgment is not appropriate.  First, Colis is a managing agent.

4    Colis was responsible for Trees's Southern California region, and supervised 18 to 24 two-man

5    crews in California, and 8 two-man crews in Arizona, which totaled between 52 and 62

6    employees.  Each of these crews was comprised of a foreman who reported directly to Colis.

7    Trees gave Colis complete discretion in running these crews, including determining an employee's

8    ability to return to work after injury.  There was no oversight over Colis's decision to hire, fire, or

9    assess returns to work.  Second, Trees ratified Colis's actions.  Scott Huffmaster was the regional

10   manager at the relevant time, and also performed a supervising role for Southern California.

11   Huffmaster was on notice of Colis's actions against Taylor by March 21, 2013 when Huffmaster

12   was provided documentation for Taylor's unemployment hearing.  Huffmaster was later promoted

13   to Vice President.  The promotion of Huffmaster by Trees is ratification of Huffmaster's failure to

14   prevent disability discrimination.  Trees also promoted Agpalo in June 2014 without providing

15   any disability discrimination training.  Instead of repudiating the conduct against Taylor, Trees

16   gave promotions.  Third, Trees does not maintain a corporate policy in its Regional Policy Manual

17   regarding the federal Americans with Disabilities Act ("ADA") or California law.  Trees's Policy

18   Manual was last updated in March 2002.  Trees chose not to train employees on disability

19   discrimination and chose not to adopt a policy to prevent disability discrimination.  Finally, Trees

20   maintains illegal policies under the FMLA and FEHA because it provides a policy that under no

21   circumstances will a leave of absence be approved for longer than 12 work weeks, and it requires

22   its employees to be 100% healed before returning to work.

23   _Discussion_

24   Initially, the FAC seeks punitive damages under the fifth cause of action for violation of

25   the CFRA and the FMLA.  See FAC ¶ 39.  However, punitive damages are not recoverable under

26   the FMLA.  Farrell, 530 F.3d at 1025; Liu v. Amway Corp., 347 F.3d 1125, 1133 n.6 (9th Cir.

27   2003).  Summary judgment on Taylor's claim for punitive damages under the FMLA is

28   appropriate.  See id.

1    Additionally, Taylor's opposition raises issues concerning the ADA.  However, the FAC

2 contains no claims under the ADA, rather Taylor's causes of action are brought under FEHA, the

3 CFRA, and the FMLA.  Because there are no ADA causes of action alleged in the FAC, the ADA

4 cannot serve as the basis for punitive damages in this case.

5    As for Taylor's California law claims, there are four issues raised by the parties:  whether

6 Colis was a "managing agent," whether Trees's ratified Colis's conduct, whether Trees fails to

7 maintain a disability discrimination policy, and whether Trees maintains improper/unlawful

8 policies.  The Court will address these issues separately.

9    a.    Managing Agent

10    The evidence shows that Trees was founded in 1953 and operates in 21 states.  See Kern

11 Dec. Ex. N.  At the relevant time, Scott Huffmaster was the Regional Manager, Jeff Drake was the

12 Regional Safety Supervisor, and Colis was a General Foreman in Fresno.  See Colis Dec. ¶¶ 3, 4.

13 In addition to Huffmaster, there were supervisors for Northern California and Southern California.

14 See id. at ¶ 4.  When the Southern California supervisor passed away, Huffmaster assumed the

15 role as a supervisor, and Colis assumed the field responsibilities.  See Colis Depo. 38:17-39:1.  A

16 general foreman "is a field supervisor, basically, takes care of personnel, disciplinary actions,

17 equipment."  Navarro Depo. 12:11-14.  General foremen are also involved in training crews and

18 billing.  See Agpalo Depo. 11:19-12:7.  General foremen oversee one yard and the crews within a

19 yard.  See Navarro Depo. at 12:18-21.  There were two Trees "yards" operating out of Fresno.  See

20 Colis Depo. 28:6-29:7.  At the relevant time, there were a total of between 18 and 24 two-man

21 crews in the Fresno yards.  See id. at 30:15-21.  Navarro was the general foreman for the yard at

22 Chestnut and McKinley, and Colis was the general foreman for the yard at Ashlan and West.[9]  See

23

24 [9] Taylor declared that "In Fresno all Trees,'s [sic] Inc. foremen reported to Ronnie Colis."  See Taylor Dec. ¶ 4.  Trees
objects that Taylor was not a foreman or and there is no showing that he understood Trees's supervisory structure in

25 Fresno; therefore Taylor's statement lacks knowledge and foundation.  See Doc. No. 53-2.  The Court finds merit to
Trees's position.  There is nothing in the body of the declaration that indicates how Taylor would have knowledge of

26 how the two Trees yards in Fresno were managed between late September 2012 and early January 2013.  Moreover,
Taylor submitted PUMF's 6, 16, and 21.  PUMF 6 states that Colis was a general foreman, PUMF 16 states that Colis

27 was in charge of the Ashlan yard when he was in Arizona, and PUMF 21 states that a general foreman is in charge of
one yard and the crews in that yard.  See PUMF's 6, 16, 21.  These PUMF's are contrary to the notion that Colis was

28 in charge of both Fresno yards.  Finally, Taylor cites no testimony from any person within Trees's management
structure (including Colis) that demonstrates that Colis was in charge of both Fresno yards.

1  Navarro Depo. 15:1-21, 36:12-18; Colis Depo. 28:22-29:4, 49:15-21; PUMF's 6, 16, 21.  From

2  November 2012 to February 2013, Colis also supervised 6 two-man crews in Arizona, but each of

3  these crews were taken from both of the Fresno yards.  See Colis Depo. 25:6-27:24.  As a person

4  in charge of field operations, Colis made decisions as to whether an employee could be

5  accommodated  in light of a doctor's recommendation or release.  See Colis Depo. 122:2-18.  If an

6  accommodation situation escalated, communications from Huffmaster or Drake may come down

7  to Colis.  See id.  Colis does not have the authority to extend an employee's leave.  See Colis

8  Depo. 222:11-18.  Colis has declared:  ". . . I have not made, and do not make, corporate policy for

9  Trees.  Even though I have the authority to hire and fire employees, I do not have the ability to

10  exercise, and do not exercise, substantial discretionary authority over decisions that determine

11  corporate policy and do not exercise discretionary authority over significant aspects of Trees's

12  business.  My role with respect to company policy is simply to follow policies developed by

13  higher level management in my region or by Trees's corporate office in Willow Grove,

14  Pennsylvania."  Colis Dec. ¶ 5.  Colis made the decision to terminate Taylor's employment.  See

15  id. at ¶ 3.

16      A corporate employer may not be held liable for punitive damages arising from the acts of

17  an employee unless "an officer, director, or managing agent of the corporation . . . had advance

18  knowledge of the unfitness of the employee and employed him or her with a conscious disregard

19  of the rights or safety of others or authorized or ratified the wrongful conduct for which the

20  damages are awarded or was personally guilty of oppression, fraud, or malice."  Cal. Civ. Code

21  § 3294(b).  "Managing agents" are "those corporate employees who exercise substantial

22  independent authority and judgment in their corporate decision-making so that their decisions

23  ultimately determine corporate policy."  White v. Ultramar, Inc., 21 Cal.4th 563, 566-67 (1999).

24  These are corporate policies that "affect a substantial portion of the company and that are the type

25  likely to come to the attention of corporate leadership."  Roby v. McKesson Corp., 47 Cal.4th 686,

26  714 (2009).  "Corporate policies" are generally viewed as the "general principles which guide a

27  corporation, or rules intended to be followed consistently over time in corporate operations."  Cruz

28  v. Homebase, 83 Cal.App.4th 160, 167 (2000).  Whether "a supervisor is a managing agent within

1  the meaning of [§ 3294] does not necessarily hinge on their level in the corporate hierarchy."

2  Muniz v. UPS, 731 F.Supp.2d 961, 976 (N.D. Cal. 2010); Myers v. Trendwest Resorts, Inc., 148

3  Cal.App.4th 1403, 1437 (2007); see White, 21 Cal.4th at 576-77.  "Rather, the critical inquiry is

4  the degree of discretion the employees possess in making decisions that will ultimately determine

5  corporate policy."  Muniz, 731 F.Supp.2d at 977; Myers, 148 Cal.App.4th at 1437.  A plaintiff

6  must demonstrate that an alleged managing agent exercises "substantial discretionary authority

7  over significant aspects of a corporation's business."  White, 21 Cal.4th at 577.  Whether

8  employees exercise sufficient authority is determined on a case-by-case basis.  Id. at 567.

9      Here, the evidence that Taylor cites in his opposition does not actually support his

10  arguments.  The evidence does not show that Colis was in charge of all of Trees's operations in

11  Fresno or Southern California, rather the evidence shows that Colis was the General Foreman for

12  one of the two Trees yards in Fresno.  See Navarro Depo. 12:18-21, 15:1-21; Colis Depo. 49:15-

13  21.  There is no evidence regarding how many other yards that Trees had in California or the

14  United States, or how Trees viewed the Fresno yards or Colis's yard in particular.  The evidence

15  does show that Trees is in 21 states, see PUMF 35, that there were other Trees officers over Colis,

16  see Colis Dec. ¶ 4; Colis Depo. 122:2-18, and that Trees has offices or yards in other California

17  cities, including Yuba City, Modesto, Tulare, Sacramento, Turlock, Stockton, Jamestown, Paso

18  Robles, Sonora, and Watsonville.  See PUMF 37; Trees Ex. 11 at 4:16-24.  Further, the evidence

19  does not support the assertion that Colis supervised between 52 and 62 employees at the relevant

20  time.  Assuming that the crews were divided equally between the two yards in Fresno, Colis

21  would have supervised between 9 and 12 crews in Fresno.  Although the evidence shows that

22  Colis also supervised 6 crews in Arizona as part of a special assignment, these crews were taken

23  from both of the Fresno yards.  That is, at the relevant time Colis supervised only Fresno based

24  crews.  Since each crew has 2 people, the most people that Colis would have supervised would

25  have been 34 (12 from Colis's Fresno yard plus a maximum of 5 crews from Navarro's yard).

26  There is insufficient evidence that the Fresno yard managed by Colis was a substantial portion of

27  Trees's business.  Cf. White, 21 Cal.4th at 577 (holding that a manager who managed 65

28  employees and who was responsible for 8 stores was a substantial portion of corporation's

1  business).[10]

2    Additionally, the evidence does not show that Colis had broad or unlimited authority.

3  Although Colis had the ability to hire and fire, discipline, and train employees, there is no

4  evidence that describes the nature or extent of Colis's authority in these areas.[11]  Further, Colis

5  expressly did not have the authority to extend FMLA leave, and he did not grant FMLA leave or

6  determine when FMLA leave expired.  Finally, it does appear that Colis had discretionary

7  authority regarding accommodations and ensuring that medical restrictions were followed.  See

8  122:14-18.  However, that authority was not unlimited.  If an accommodation situation escalated

9  beyond Colis's decision, two Trees officers above Colis could get involved – Huffmaster and

10  Drake.  See Colis Depo. 122:2-18.  Taylor has submitted no other evidence that describes the

11  nature of Colis's authority.

12    Because the evidence does not indicate that Colis had substantial discretionary authority

13  over significant aspects of Trees's business, or that Colis's decisions created corporate policy,

14  Colis was not a "managing agent."  See Roby, 47 Cal.4th at 714; White, 21 Cal.4th at 566-67, 577.

15  Summary judgment in favor of Trees on this issue is appropriate.  See id.

16    b.    Ratification

17    "For purposes of determining an employer's liability for punitive damages, ratification

18  generally occurs where, under the particular circumstances, the employer demonstrates an intent to

19  adopt or approve oppressive, fraudulent, or malicious behavior by an employee in the performance

20  of his job duties."  College Hosp. Inc. v. Superior Ct., 8 Cal.4th 704, 726 (1994).  "Corporate

21  ratification in the punitive damages context requires actual knowledge of the conduct and its

22  outrageous nature."  Id.

23    Here, with respect to the promotion of Agpalo, there is no evidence that Agpalo

24  participated in any way in the decision to terminate Taylor.  The evidence only shows that Agpalo

25  ────────────────

26  [10] Even if the Court found that Colis supervised both of Trees's yard in Fresno, the result would not change.  The total
number of crews supervised would have been between 18 and 24, plus Navarro.  Therefore, Colis would have
supervised between 37 and 49 employees.  Those figures are less than the 65 employees in White, and there would

27  still be no showing that such numbers reflect a substantial portion of Trees's business.  Cf. White, 21 Cal.4th at 577.

28  [11] The ability to hire or fire may be considered, but it alone does not make one a "managing agent."  White, 21 Cal.4th
at 567.

1   told Taylor about the termination.  See PUMF's 149, 153, 155.  Promoting Agpalo appears

2   completely unconnected to Taylor's termination, and it is unknown how Agpalo's promotion

3   could possibly show ratification of Colis's allegedly improper conduct.

4          With respect to the promotion of Huffmaster to Vice President, again, there is no evidence

5   that Huffmaster participated in any way in the decision to terminate Taylor.  Like Agpalo's

6   promotion, there is nothing that would connect the promotion of Huffmaster with Colis's

7   termination of Taylor or Colis's failure to accommodate Taylor.

8          Taylor argues that Huffmaster was a Regional Manager and was on notice of Colis's

9   discriminatory action in March 2013 when Barbara Krumm provided him documentation of

10  Taylor's unemployment benefits hearing, which included the entire appeals history.  Assuming

11  that prior to his promotion to Vice President that Huffmaster was a "managing agent" who could

12  ratify Colis's conduct,[12] Taylor cites no evidence that demonstrates actual knowledge by

13  Huffmaster of Colis's conduct.  Taylor cites no evidence in support of his assertion that Krumm

14  provided Huffmaster with documentation, including the entire unemployment benefits appeals

15  file.  Moreover, there is no evidence about what the documentation actually consisted of, nor is

16  there evidence that Huffmaster actually reviewed any documentation.  An attorney's unsupported

17  assertions cannot create genuine disputed issues of material fact.  See Barcamerica Int'l USA

18  Trust v. Tyfield Importers, Inc., 289 F.3d 589, 593 n.4 (9th Cir. 2002); Angel v. Seattle-First Nat'l

19  Bank, 653 F.2d 1293, 1299 (9th Cir. 1982).  Therefore, Taylor has not shown that Huffmaster had

20  actual knowledge of malicious, oppressive, or fraudulent conduct by Colis, and approved that

21  conduct prior to his promotion.[13]  See College Hosp., 8 Cal.4th at 726.

22         Although unclear, it appears that Taylor also argues that after Huffmaster was promoted to

23  Vice President, he provided interrogatory responses in this case that contradict Colis's declaration.

24  However, Taylor again does not demonstrate actual knowledge by Huffmaster of Colis's allegedly

25  oppressive, malicious, or fraudulent conduct.  Taylor does not explain what aspects of the

26  _____

[12] Trees makes no argument that Huffmaster as a Regional Manager was not a "managing agent."

27

[13] Taylor argues that Huffmaster had knowledge of the massive FMLA backlog in Trees's Willow Grove corporate
28  office.  However, the PUMF cited in support of this assertion merely states that there was a backlog, it says nothing
about Huffmaster's knoweldge.  See PUMF26.

1    interrogatory response are sufficient to show adoption of Colis's conduct by Huffmaster.  Without

2    more, merely signing interrogatory responses as a corporate officer does not show actual

3    knowledge and adoption of another's conduct.

4          Because the evidence does not show actual knowledge and adoption of malicious,

5    oppressive, or fraudulent conduct, summary judgment in favor of Trees on this theory is proper.

6                    c.       Failing To Maintain Policy Of Preventing Disability Discrimination

7          Taylor contends that Trees does not have policies regarding disability discrimination.

8    Trees has cited two pages in its employee manual that expressly state that it is Trees's intent to

9    provide equal employment opportunity and to not discriminate on the basis of, *inter alia*,

10   disability.  See Trees Bates Nos. 00100-00102.  However, Taylor appears to be correct that there

11   are no dedicated disability policies.  Trees has generally cited the Court to a 62-page "return to

12   work program," but the first sentence of the first page of that policy indicates that it relates to

13   Worker's Compensation claims.  Trees cites no specific pages that discuss disability

14   discrimination, accommodation, or the interactive processes.  Cf. Simmons, 609 F.3d at 1017

15   (holding that litigants are under an obligation to cite to evidence with reasonable particularity).

16         Nevertheless, Taylor cites no California cases or statutes that hold a corporation liable for

17   punitive damages based on a failure to maintain a specific policy.  The Court has found one

18   California case that has dealt with the issue.  In *Mathieu v. Norrell Corp.*, 115 Cal.App.4th 1174,

19   1190 (2004), the plaintiff argued that a corporation's failure to maintain a sexual harassment

20   policy was so wrongful that punitive damages were justified.  The trial court ruled against the

21   plaintiff's theory and declined to "create new punitive damages liability without legislative history

22   or case authority justifying such an expansion of the law."  Id.  The *Mathieu* court affirmed.  The

23   court of appeal "agreed" with the trial court and also characterized the plaintiff's position as a

24   "legally unsupported contention that an employer's failure to have a policy against sexual

25   harassment could constitute oppression, fraud, or malice . . . ."  Id. at 1191; see Riordan v. Federal

26   Express Corp., 2008 U.S. Dist. LEXIS 108323, *52-*53 (E.D. Cal. Aug. 4, 2008).  This is

27   consistent with the CACI jury instructions, which do not include an instruction for punitive

28   damages based on the failure to maintain a particular policy.  See CACI §§ 3940-3949.

1    Without more from Taylor, the absence of a substantial policy regarding FEHA disability

2    discrimination is not enough to impose punitive damages on Trees.  See Mathieu, 115 Cal.App.4th

3    at 1190-91.  Summary adjudication on this issue in favor of Trees is appropriate.

4         d.      "Illegal" Policies

5              i.      No Leave Beyond 12 Weeks

6    Taylor argues that Trees has an illegal policy of not extending leave beyond 12 weeks,

7    which he contends is contrary to the FMLA and FEHA/CFRA.  The Court does not agree.

8    First, while Trees's FMLA policy does state that it provides 12 weeks of leave, it also

9    expressly provides that if state law modifies FMLA leave, then the policy "will be adjusted to

10   comply with the state law."  See Trees Bates No. 00104.  Thus, Trees's FMLA policy by its own

11   terms is not as limited as Taylor suggests.  Second, both the FMLA and the CFRA entitle an

12   eligible employee to a total of 12 weeks leave during any 12-month period for family care and

13   medical care.  29 U.S.C. 2612(a)(1); Cal. Gov't Code 12945.2(a). Courts reviewing the CFRA and

14   the FMLA have concluded that the statutes only ensure protected leave for a 12-week period.[14]

15   See Dixon v. Public Health Trust, 567 Fed. Appx. 822, 825-826 (11th Cir. 2014); Ackerman v.

16   Beth Isr. Cemetery Ass'n of Woodbridge, 2010 U.S. Dist. LEXIS 63547, 21-23 (D. N.J. June 25,

17   2010); Rogers v. County of Los Angeles, 198 Cal.App.4th 480, 489 (2011).  Taylor cites no cases

18   that hold an employer is required to extend FMLA or CFRA leave beyond 12 weeks.  Therefore,

19   Taylor has not shown that limiting FMLA or CFRA leave to 12 weeks is illegal.[15]

20              ii.      100% Healed

21   "A policy requiring an employee to be '100 percent healed' before returning to work is a

22   per se violation of the FEHA because it permits an employer to avoid the required individualized

23   assessment of the employee's ability to perform the essential functions of the job with or without

24

---

25   [14] The 12-week period granted by the CFRA runs concurrently with the 12-week period granted by the FMLA, meaning that an employee eligible under both statutes is entitled to only 12 weeks of leave in total.  See Cal. Gov't

26   Code 12945.2(s); Rincon v. Am. Fedn. of State, 2013 U.S. Dist. LEXIS 114403, *40-*41 (N.D. Cal. Aug. 13, 2013).

27   [15] The Court notes that Taylor has not shown that the 12-week FMLA leave period is applied to situations other than those involving the FMLA/CFRA.  Cf. Sanchez v. Swissport, Inc., 213 Cal.App.4th 1331 (2013) (finding that

28   compliance with FEHA § 12945, which provides 4-months of pregnancy leave, did not insulate an employer from liability under other portions of FEHA).

accommodation." <u>UPS v. Department of Fair Employment and Housing</u>, 2014 Cal.App. Unpub. LEXIS 3048, *36-37 n.5 (2014); <u>Gelfo v. Lockheed Martin Corp.</u>, 140 Cal. App. 4th 34, 49-50 n.1 (2006); <u>see</u> 2 C.C.R. § 7293.9(i) ("In the absence of an individualized assessment, an employer . . . shall not impose a "100 percent healed" or "fully healed" policy before he employee can return to work after an illness or injury."); <u>see also</u> <u>McGregor v. AMTRAK</u>, 187 F.3d 1113, 1116 (9th Cir. 1999) (holding that a "100% healed" return to work policy violates the ADA *per se*).

Here, Colis declared that he reviewed the November Release and concluded that Taylor could not perform the position of Groundsman. <u>See</u> Colis Dec. ¶ 7.  However, there is also evidence that, on February 25, 2013, Paula St. Cyr (who worked at Trees's Willow Grove administrative offices as a benefits specialist, <u>see</u> St. Cyr Depo. 13:13-24) sent an e-mail regarding Taylor and "FMLA/Return To Work." <u>See</u> Trees Bates No. 00044.  The e-mail indicates that Taylor had been on FMLA leave since October 6, 2012, and asked whether "anyone heard from him or his doctor as to whether or not he will be returning to work and when, and if not, what is the regions decision on his being out so long?  We need this information in order to update his FMLA status." <u>Id.</u>  The next day, Colis responded to the e-mail.  Colis wrote, "Last I Hurd [sic] he was never going to be 100% due to him injuring his back on the weekend.  We also are not in a position to add employees at this time." <u>Id.</u>  St. Cyr testified that she had no memory of contacting Human Resources about Colis's e-mail response, but if she received an e-mail like that today she would contact Human Resources. <u>See</u> St. Cyr Depo. 107:8-24.  Also, Bethany Mira, who is a benefits supervisor in the Human Resources benefits department, was asked during her deposition if it was her understanding that if a person is not 100% then the person cannot return to work. <u>See</u> Mira Depo. 83:19-21.  Mira responded that it "isn't necessarily the understanding," that once FMLA is "up" it goes to the Region, but that her "understanding is that, in many cases, because of the work they do, that you have to be able to do 100 percent of whatever the job calls for."[16] <u>Id.</u> at 84: 8-14.  Mira also testified that she does not train her staff to view a 100% healed policy as inappropriate. <u>See id.</u> at 88:9-13.  Also, at the relevant time Penny Powell was a benefits specialist in the Human Resources department. <u>See</u> Powell Depo. 8:19-10:8, 15:19-16:2. When

---

[16] Mira also testified that she does not know what the specific return to work policy is. <u>See</u> Mira Depo. 84:20-22.

asked if she was familiar with a policy of an employee having to be 100% healed before they could come back to work for Trees, Powell answered, "Yeah. I mean, it's common practice that if an employee has restrictions, that they are not able to return." Id. at 84:4-13. When asked whether that meant "any restriction and they can't return," Powell responded, "Typically, yes, yes." Id. at 84:15-19. Finally, after Taylor submitted the November Release, Agpalo explained that Taylor would not be allowed back to work unless Taylor was 100%. See PUMF 131.

Viewing the evidence in the light most favorable to Taylor and making all reasonable inferences in his favor, see Narayan, 616 F.3d at 899, the evidence indicates that Trees has a formal policy of not permitting employees to return to work unless they are 100% healed or fully recovered. The combined testimony of Powell, St. Cyr, and Mira indicate the existence of a 100% healed policy and no acknowledgement (at least from October 2012 through February 2013) that such a policy is inappropriate. Moreover, Agpalo's explanation to Taylor in November 2012 was essentially an invocation of that policy. Colis has indicated that he considered the November Release when he refused to permit Taylor to return to work. However, Colis's declaration does not discuss why reasonable accommodations were unavailable, and Colis's actual analysis of the November Release and possible accommodations are not explained. Under the 100% healed policy, any analysis of the November Release could have been perfunctory – because there were restrictions, Taylor could not return. Also, Colis's February 26 e-mail raises significant concerns. Instead of responding that Taylor had already been terminated because he exceeded his FMLA leave, Colis responded that Taylor was never going to be 100%. Reference to not being 100% is consistent with Trees having a 100% healed policy. Further, the response is incorrect. At least as of January 8, 2013, Taylor was 100% healthy, and Taylor had so informed Trees.

In sum, there are genuine issues of disputed material fact with respect to the existence and application of a 100% healed policy in this case. Summary judgment on this issue will be denied.

**4.**     **FEHA § 12940(m) – Failure to Accommodate**

*Defendant's Argument*

Trees argues that this claim is based on the November Release, which released Taylor to

1   return to work with severely limiting restrictions.  However, at the time, there was no other work

2   that Taylor could perform safely.  There is no requirement to create a new position or create a

3   temporary light-duty assignment.  Taylor cannot point to any comparable situation in which he

4   was treated differently than other employees.  Because no reasonable accommodation was

5   available, summary judgment is appropriate.

6   *Plaintiff's Opposition*

7   Taylor argues that Trees has failed to establish the essential functions of any job titles.

8   Without establishing the essential functions of any jobs, there is no way to determine whether

9   Taylor could perform these positions, especially Groundsman, either with or without reasonable

10   accommodation.  Taylor also argues that additional leave was a possible accommodation, as well

11   as modified work.  Agpalo, Colis, and Navarro testified to instances in which modified duties or

12   light duty positions have been utilized.

13   *Legal Standard*

14   FEHA prohibits an employer from failing "to make reasonable accommodation for the

15   known physical or mental disability of an ... employee."  Cal. Gov. Code § 12940(m).  The

16   essential elements of a claim of failure to accommodate claim are: (1) the plaintiff has a disability

17   covered by FEHA; (2) the plaintiff is a qualified individual; and (3) the employer failed to

18   reasonably accommodate the plaintiff's disability.  Furtado v. State Personnel Bd., 212

19   Cal.App.4th 729, 744 (2013). A plaintiff is a "qualified individual" if he can perform the essential

20   functions of the desired job either with or without accommodation.  Cuiellette v. City of Los

21   Angeles, 194 Cal.App.4th 757, 766 (2011).  "Reasonable accommodation" means "a modification

22   or adjustment to the workplace that enables the employee to perform the essential functions of the

23   job held or desired."  Lui v. City & County of San Francisco, 211 Cal.App.4th 962, 971 (2012).

24   "Reasonable accommodation" may include: (1) making existing facilities used by employees

25   readily accessible to, and usable by, individuals with disabilities; or (2) job restructuring, part-time

26   or modified work schedules, reassignment to a vacant position, acquisition or modification of

27   equipment or devices, adjustment or modifications of examinations, training materials or policies,

28   the provision of qualified readers or interpreters, and other similar accommodations for individuals

with disabilities.  Cal. Gov. Code § 12926(o); Furtado, 212 Cal.App.4th at 745.  A reassignment

"is not required if there is no vacant position for which the employee is qualified."  Cuiellette, 194

Cal.App.4th at 767.  The obligation to reassign an employee "does not require creating a new job,

moving another employee, promoting the disabled employee, or violating another employee's

rights under a collective bargaining agreement."  Furtado, 212 Cal.App.4th at 745.  Where an

employer does not regularly do so, an employer is not required to create light-duty positions, nor

is the employer required to make permanent any temporary positions that were created.  Raine v.

City of Burbank, 135 Cal.App.4th 1215, 1225-26 (2006).  "What is required is the duty to reassign

a disabled employee if an already funded, vacant position at the same level exists."  Cuiellette, 194

Cal.App.4th at 767.  An employer is not required to exempt an employee from performing

essential functions or to reallocate essential functions to other employees.  Department of Fair

Empl. & Hous. v. Lucent Techs., Inc., 642 F.3d 728, 744 (9th Cir. 2011); Dark v. Curry County,

451 F.3d 1078, 1089 (9th Cir. 2006).  Also, "[h]olding a job open for a disabled employee who

needs time to recuperate or heal is in itself a form of reasonable accommodation and may be all

that is required where it appears likely that employee will be able to return to an existing position

at some time in the foreseeable future."  Jensen v. Wells Fargo Bank, 85 Cal.App.4th 245, 263

(2000); see also Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1247 (9th Cir. 1999).  "An

employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate

unless it establishes through undisputed facts that reasonable accommodation was offered and

refused, that there simply was no vacant position within the employer's organization for which the

disabled employee was qualified and which the disabled employee was capable of performing

with or without accommodation, or that the employer did everything in its power to find a

reasonable accommodation, but the informal interactive process broke down because the employee

failed to engage in discussions in good faith.  Lucent Techs., 642 F.3d at 744; Jensen, 85

Cal.App.4th at 263.

    *Discussion*

        Taylor does not challenge the characterization of this cause of action by Trees, i.e. that the

focus is on Trees's conduct with respect to the November Release.  Given that on January 8, 2013,

1  Taylor was cleared to return to his job without restrictions, and Taylor's failure to challenge

2  Trees's characterization, the Court will view Taylor's § 12940(m) claim as being based on the

3  refusal to let Taylor return to work when he presented the November Release to Trees.  So

4  viewing this cause of action, there are several issues encompassed within Taylor's claim: whether

5  other individuals received modified or light duty work while Taylor did not, whether additional

6  leave was a reasonable accommodation, and whether there were other jobs that Taylor could

7  perform.  The Court will address these issues separately.

8          <u>a.</u>    <u>Treatment of Other Trees's Employees</u>

9       Taylor argues that an employee named Lloyd was placed on light duty, Navarro had placed

10  two employees on light duty, Agpalo indicated that a lot of people have been given light duty at

11  Trees, and Colis has placed workers on light duty jobs including Agpalo.  <u>See</u> PUMF's 53-68.

12       With respect to employee Lloyd, Colis testified that Lloyd had been given FMLA leave to

13  care for a relative who was experiencing a medical problem.  <u>See</u> Colis Depo. 99:3-13.  Navarro

14  (who was Lloyd's general foreman) testified that he could not recall Lloyd having light duty, and

15  Colis testified that he was not aware of Lloyd being assigned to pick up trash.  <u>See id.</u> at 54:10-18;

16  Navarro Depo. 18:21-19:14.  Terry Colis, who is Colis's mother and an employee of Trees,

17  testified that she "believed" Lloyd had light duty at Navarro's yard, but she could not remember

18  what the light duty involved, how long Lloyd was on light duty, whether Lloyd complained about

19  the light duty work, or whether Lloyd was frustrated with light duty.  <u>See</u> Theresa Colis Depo.

20  77:4-78:2.  When asked how she came to believe that Lloyd was on light duty, Terry Colis replied

21  that she just remembered "hearing about it."  <u>Id.</u> at 77:22-24.  Agpalo testified that he might have

22  heard that Lloyd was off on disability and Lloyd was frustrated by doing light work, but that he

23  did not know.  <u>See</u> Agpalo Depo. 90:23-91:3.  Agpalo did not know whether Lloyd was actually

24  on light duty, but assumed that Lloyd was.  <u>See id.</u> at 91:10-21.

25       The evidence about Lloyd is not probative.  As indicated, there is no clear evidence about

26  whether Lloyd was actually on light duty.  Terry Colis's testimony appears to be based on hearsay

27  and she cannot remember any relevant details.  Agpalo made assumptions and stated repeatedly

28  that he did not know if Lloyd was on light duty or whether he actually heard that Lloyd was on

1   light duty.  Moreover, there is no evidence that describes what light duty Lloyd may have been on

2   or for what period of time Lloyd was on it, and Lloyd's FMLA leave was nothing like Taylor's.

3   Lloyd's FMLA leave did not involve an injury to himself, rather it dealt with a family member.

4   Critically, Lloyd did not provide Trees with a release to work that provided physical restrictions

5   on the work that could be done.  There is nothing to indicate that Lloyd's situation was

6   comparable to Taylor's situation.

7       With respect to Navarro placing individuals on light duty, Navarro testified that he has had

8   two employees on light duty.  See Navarro Depo. 19:22-25.  One employee had a strained

9   shoulder, and the other had a strained wrist or elbow.  See id. at 19:25-20:11.  Navarro put these

10  two employees on a three-man crew "for a couple of days" so that the employees could strengthen

11  and heal.  See id.  Navarro did this as part of his own discretion and without the approval of

12  anyone above him.  See id. at 20:12-13.  Navarro did not rely on any doctor's notes in designing

13  the light duty jobs, rather the situations were basically the employees informing Navarro that they

14  were feeling tightness and Navarro accommodating them by placing them on a three-man crew.

15  See id. at 20:19-25.

16      The Court does not find Navarro's testimony to be probative.  What Navarro described was

17  something that was unique to him, and there is no evidence that Navarro was following any

18  policies.  Moreover, there is no actual description of what the light duties were that the two

19  employees performed.  What is apparent is that Navarro's assignments were not part of a long

20  term practice, rather the employees were on light duty for "a couple of days."  No doctors notes

21  and no medical restrictions were involved, and there is no indication that the "strains" suffered by

22  these two employees were anything close to the back and neck pain/condition that afflicted Taylor.

23  Cf. DUMF 21.[17]  Taylor's restrictions were in place from November 16 to January 8, well beyond

24  the "couple of days" needed by Navarro's men.

25

26  [17] DUMF 21 cites part of Dr. Roth's deposition testimony about Taylor.  In pertinent part, Dr. Roth testified:  "Based
    on [Taylor's] initial visit here, I did not feel [Taylor] was capable of doing any work.  He could barely sit comfortably

27  in the room.  He was writhing – displaying severe pain, and was encouraged to do nothing, at least those first few
    days.  And he continued to exhibit a substantial amount of pain for which he was debilitated and was unable to

28  perform his job duties.  He could not perform his job duties until about January 8, until he was finally released."
    DUMF 21 (Roth Depo. 91:25-92:21).

With respect to Agpalo's testimony about "a lot" of employees, Agpalo testified that "a lot of people" had been given light duty at Trees, but that he did not know the names of those people. See Agpalo Depo. 82:18-25. Agpalo testified that the type of light duty was between the employee and the manager, the light duty occurred prior to him being in management, and the light duty assignments did not involve him. See id. at 83:1-8.

The Court does not find this testimony to be probative. Agpalo's testimony concerning light duty deals with his observations of other employees when he was not in management. Those assignments and situations did not involve Agpalo. Agpalo provided no details about what light duties were being performed, the reason for the light duties, whether medical restrictions or releases were involved, or the duration of any light duty jobs.

Finally, Colis testified about modified jobs and other employees who took FMLA leave. Colis testified that he gave Agpalo a job as a Groundsman when Agpalo was unable to climb, and also gave a Climber a Groundsman position when the Climber had a strained hand. See Colis Depo. 58:8-10, 107:8-20. Colis testified that the types of modified duties that an employee may be given depends on the medical restrictions that are in place, and that he tried to follow the doctors' notes. See id. at 55:8-56:23, 58:10-16. Colis also testified about four employees (other than Taylor) who had been on FMLA leave. See id. at 99:3-101:22. Of the four, two involved leave due to a family member's illness, one involved an individual who was injured but who voluntarily separated from Trees, and one involved an individual who returned to work prior to expiration of his FMLA leave because he had a doctor's full release to work. See id.

Again, the Court does not find Colis's testimony to be probative. Nothing about Colis's testimony reflects situations that are meaningfully comparable to Taylor's situation. The situation with Agpalo appears to have only involved a restriction of no climbing, and the unknown Climber who was given a Groundsman position appears to have only had a strained hand. There is no indication of what other restrictions may have been imposed or for how long the individuals were in these Groundsman positions. The injuries of Agpalo and the Climber appear to be materially different from Taylor's condition. Cf. DUMF 21. As for the other employees on FMLA leave, as described, none of the four where in similar a position compared to Taylor. Two of the four did

1    not even have restrictions because the leave was due to a family member.

2        In sum, none of the evidence cited by Taylor indicates that he was treated differently in

3    terms of an accommodation.

4            b.      Additional Leave

5        It is settled that an additional period of unpaid leave may constitute a reasonable

6    accommodation if the employee is likely to be able to return to work in the foreseeable future and

7    there is not an undue burden on the employer.  See Nunes, 164 F.3d at 1247; Jones v. Social

8    Vocational Servs., Inc., 2008 Cal.App. Unpub. LEXIS 5104, *20-*21 (June 24, 2008); Jensen, 85

9    Cal.App.4th at 263; Hanson v. Lucky Stores, Inc., 74 Cal.App.4th 215, 226 (1999).  However, it is

10   unclear how Taylor contends that additional leave applies in this case.  Taylor's argument on this

11   issue is brief.  There is a section that cites to *Nunes*, but there is no real application of the law to

12   the facts.  The absence of an application of the law is problematic because it appears that when

13   Taylor presented the November Release to Trees, he was still on FMLA leave.  The parties do not

14   state exactly when Taylor's leave expired, but the FAC alleges that Dr. Roth indicated in the

15   FMLA paperwork that Taylor needed six to eight weeks to recover.  See FAC ¶ 8.  If Taylor went

16   on FMLA leave in the beginning of October, eight weeks would put expiration of FMLA leave at

17   the beginning of December.[18]  Thus, Taylor was still on FMLA leave, and likely was on that leave

18   at least to the beginning of December.  Without a properly developed argument from Taylor,

19   additional leave time as a reasonable accommodation cannot defeat Trees' motion.

20           c.      Other Positions

21       Trees may be granted summary judgment if it demonstrates that there was "no vacant

22   position within the employer's organization for which the disabled employee was qualified and

23   which the disabled employee was capable of performing with or without accommodation."  Lucent

24   Techs., 642 F.3d at 744; Jensen, 85 Cal.App.4th at 263.  Whether a disabled employee was

25   capable of performing the job at issue depends in part on the "essential functions" of the job.  See

26

27   _____

[18] The Court notes that Taylor was sent a document that indicated his FMLA expired on November 30, 2012.  See
DUMF 163.  However, the parties have not expressly stated that this is actually when his leave expired.  In any event,
28   a November 30 expiration confirms that Taylor remained on leave following his presentation of the November
Release to Trees.

1   Lucient Techs., 642 F.3d at 744; Lui, 211 Cal.App.4th at 971.  "Essential functions" are

2   "fundamental job duties of the employment position [at issue]," but do not include "the marginal

3   functions of the position."  Bates v. United Parcel Svc., Inc., 511 F.3d 974, 990 (9th Cir. 2007);

4   Lui, 211 Cal.App.4th 962, 971.  "A highly fact-specific inquiry is necessary to determine what a

5   particular job's essential functions are."  Cripe v. City of San Jose, 261 F.3d 877, 888 n.12 (9th

6   Cir. 2001); see Lui, 211 Cal.App.4th at 971.  "Although the plaintiff bears the ultimate burden of

7   persuading the fact finder that he can perform the job's essential functions . . . an employer who

8   disputes the plaintiff's claim that he can perform the essential functions must put forth evidence

9   establishing those functions."  Bates, 511 F.3d at 991; see also Tejada v. Conagra Foods, Inc., 357

10  Fed. Appx. 805, 807 (9th Cir. 2009).  The parties in their respective briefing have raised two jobs

11  that may have been available to Taylor:  Flagger and Groundsman.[19]

12          The position of Flagger was raised during the deposition of Dr. Roth, but was not

13  mentioned as part of Taylor's opposition.  Although Dr. Roth testified that Taylor could have

14  performed the position of Flagger, see DUMF 21, Trees did not have a Flagger position available

15  in Fresno or within 175 miles of Fresno between September 15, 2012 and April 1, 2013.  See

16  Trees Ex. 11 at 4:7-12.  Because there was no open Flagger position, reassigning Taylor to this job

17  was not a reasonable accommodation.  See Furtado, 212 Cal.App.4th at 745; Cuiellette, 194

18  Cal.App.4th at 767.

19          With respect to the Groundsman position, Trees's interrogatory responses indicate that a

20  Groundsman position was available in Fresno sometime between September 15, 2012 and April 1,

21  2013.  See Trees Ex. 11 at 4:26-5:9.  Without more specific time frames, the Court will infer that a

22  Groundsman position was available around November 19, 2012.  See Narayan, 616 F.3d at 899.

23  In terms of whether Taylor could have performed that job, Trees relies on evidence from Colis,

24  Dr. Roth, and Taylor.

25

26  [19] Although Taylor states that Trees did not establish the essential job functions of any job, including Climber I and
    Climber II, Taylor specifically argued that Trees's evidence did not demonstrate the essential duties of a Groundsman.

27  See Doc. No. 46 at 1313-27.  Given that the November Release entailed a "no climbing restriction," the title of the
    Climber jobs indicate that "climbing" is an essential function (which is also supported by Colis moving Agpalo to a

28  Groundsman position when Agpalo had a "no climbing" restriction), and Taylor's opposition, the Court will not
    consider Climber I and Climber II positions as possible reasonable accommodations.

Colis declared that there are certain duties that are "crucial" and performed on "an almost daily, if not a daily basis," including:  "(1) using chain saws to cut brush and tree stumps; (2) dragging of brush, cut tree stumps, and sometimes other things, such as tarps or garbage cans full of brush, branches, and leaves; and (3) feeding and guiding branches and tree stumps though a wood chipper."  Colis Dec. ¶ 6.  In light of the restrictions in the November Release, Colis believed that Taylor would not have been able to do a Groundsman position "without the risk of injuring himself or others."  Id. at ¶ 7.

During his deposition testimony, Dr. Roth reviewed a document entitled, "Job Description: Groundline Crewperson."  See Roth Depo. Ex. 4.  Dr. Roth testified that Taylor "would have had a high likelihood of flaring up with this kind of job."  Roth Depo. 94:22-24.  Dr. Roth indicated that frequent pulling, frequent lifting up to 50 lbs., lifting with one hand, pushing, and the possibility of wood getting caught in a chipper and jarring Taylor created a high likelihood of a flare up.[20]  See id. at 94:14-95:17.

As part of his application for unemployment benefits, Taylor checked a box that described his Climber II job as requiring him to "constantly lift, carry, push, pull, or otherwise move objects that weigh over 20 lbs; frequently over 50 lbs.; occasionally over 100 lbs."  See Taylor Depo. Ex. 8; DUMF 45.  Further, at his deposition, Taylor admitted a Groundsman position would involve the same work that he marked for his Climber II position on the unemployment form.  See Taylor Depo. 211:13-20.

However, Taylor also testified that there are "tons" of different things that a Groundsman can do, that the foremen can direct what a Groundsman does, the duties of a Groundsman can vary depending on the job site, that a Groundsman could sit or flag/watch traffic for most of the day, and that all five boxes on the unemployment form could be checked to describe a Groundsman.  See Taylor Depo. 210:19-214:24.  Taylor testified that a Groundsman might use one hand to do something on the ground, but using one hand should not be done.  See id. at 234:11-13.  Taylor also testified that the amount of brush that is picked up can be limited in size by the Groundsman

[20] However, the document reviewed did not indicate that there would be frequent lifting of 50 lbs. objects.  See Roth Depo. Ex. 4.

1   by cutting or dicing the brush.  See id. at 220:13-16.  A Groundsman could dice up brush/branches

2   into small sizes, and the goal is to make the brush weigh less than 50 lbs.  See id. at 219:21-220:7.

3   There were different sized chainsaws available depending on the job, but the larger chainsaws

4   weighed about 15 lbs.[21]  See id. at 220:13-221:20. The nature of the particular tree/job determined

5   the different responsibilities for a Groundsman.  See id. at 216:21-23.

6         Viewing the above evidence in the light most favorable to Taylor and making all

7   reasonable inferences in his favor, Narayan, 616 F.3d at 899, Taylor's deposition testimony

8   describes numerous functions performed by a Groundsman, and that the duties depend largely on

9   the particular job at hand.  Of particular note, Taylor explained that brush piles could be cut so as

10  to keep the weight low.[22]  Although Colis identified three aspects of the Groundsman job that are

11  performed on a "daily" basis, Colis did not explain how often in the day these functions occur,

12  why he believed that Taylor could not perform these functions with or without accommodation, or

13  why there was no accommodation available for Taylor to perform these functions.  With respect to

14  Dr. Roth, he was not told what the essential functions of a Groundsman were, he was not asked

15  about any particular accommodations that might be possible for some of the Groundsman duties,

16  and there has been no explanation regarding the document that Dr. Roth reviewed.

17        There is no doubt that the evidence presented by Trees raise credible concerns about the

18  validity of Taylor's cause of action.  Nevertheless, the Court does not have a clear understanding

19  of the essential functions of the Groundsman position.  Trees has not sufficiently demonstrated

20  either what the essential functions of the Groundsman are or that Taylor could not have performed

21  the job with or without reasonable accommodation.  See Tejada, 357 Fed. Appx. at 807 (finding

22  summary judgment on a § 12940(m) claim where employer had not adequately established the

23  essential functions of the job at issue); Bates, 511 F.3d at 991.  Because Trees has not sufficiently

24  demonstrated that there was "no vacant position within the employer's organization for which the

25

26  [21] Taylor testified that the largest chainsaw available weighed 40 lbs. and was used for mountain work.  See Taylor Depo. 222:6-9, 231:11-15.

27  [22] Navarro's testimony also indicates that it is possible that an employee can be given duties that have less of an impact on strained muscles.  See Navarro Depo. 19:24-20:11.  What these duties are, or how long such duties can be
28  assigned without creating an undue burden on Trees, or whether such assignments were possible given Taylor's restrictions, are unknown.  Nevertheless, Navarro's testimony indicates that some reassignments may be possible.

1   disabled employee was qualified and which the disabled employee was capable of performing

2   with or without accommodation," summary judgment on Taylor's § 12940(m) claim is improper.

3   See Lucent Techs., 642 F.3d at 744; Jensen, 85 Cal.App.4th at 263.

4

5   **5.      FEHA § 12940(n) -- Interactive Process**

6        *Parties' Arguments*

7        Trees argues that, because there was no reasonable accommodation available to Taylor,

8   any failure to engage in the interactive process is not actionable.   Taylor argues that because there

9   was reasonable accommodation available, summary judgment is improper.

10       *Discussion*

11        "The 'interactive process' required by the FEHA [§ 12940(n)] is an informal process with

12  the employee or the employee's representative, to attempt to identify a reasonable accommodation

13  that will enable the employee to perform the job effectively."  Scotch v. Art Institute of Cal., 173

14  Cal.App.4th 986, 1013 (2009).  To prevail under § 12940(n), "an employee must identify a

15  reasonable accommodation that would have been available at the time the interactive process

16  should have occurred."  Id.

17       Here, the basis for Trees's motion is that no reasonable accommodation was available.

18  However, as discussed with respect to Taylor's § 12940(m) claim, the issue of whether a

19  Groundsman job was a reasonable accommodation remains in dispute.  Because summary

20  judgment on the § 12940(m) claim is improper, summary judgment on the § 12940(n) claim is

21  also improper.  See Scotch, 173 Cal.App.4th at 1018.

22

23                                **CONCLUSION**

24       Trees moves for summary judgment on five limited issues.  First, summary judgment with

25  respect to the issue of mitigation is inappropriate because Trees did not establish that an

26  unconditional offer of reemployment was made to Taylor.  Second, summary judgment with

27  respect to the issue of emotional distress damages under FEHA is inappropriate because California

28  law does not require emotional distress as compensatory damages to be severe.  However,

1  emotional distress damages are unavailable as a matter of law with respect to Taylor's FMLA

2  claim, and summary judgment on that issue will be granted.  Third, with respect to punitive

3  damages, Taylor provided insufficient evidence of ratification of Colis's actions, insufficient

4  evidence that Colis was a managing agent, and did not show that Trees's 12-week leave policy

5  under the FMLA/CFRA was illegal.  Further, punitive damages are not available under the FMLA

6  as a matter of law.  Therefore, summary judgment on the issues of ratification, managing agent,

7  12-week leave FMLA/CFRA policy, and punitive damages under the FMLA is appropriate.

8  However, Taylor has submitted sufficient evidence that Trees maintains a standard 100% healed

9  policy for returning to work, and such a policy violates FEHA.  Summary judgment on that issue

10  is inappropriate.  Fourth, summary judgment on Taylor's failure to accommodate claim is

11  inappropriate because Trees did not show that the job of Groundsman was unavailable or an

12  unreasonable accommodation.  Fifth, summary judgment on Taylor's failure to engage in the

13  interactive process claim is inappropriate because Trees's argument was tied to the failure to

14  accommodate claim.  Because the failure to accommodate claim survives, the failure to engage in

15  the interactive process claim survives.

16

17  **<u>ORDER</u>**

18  Accordingly, IT IS HEREBY ORDERED that Trees's motion for summary judgment is:

19  1.  GRANTED with respect to emotional distress damages under the FMLA, punitive

20  damages under the FMLA, the issue of Colis as managing agent, Trees's 12-week

21  FMLA/CRA leave policy, and the issue ratification for purposes of punitive damages; and

22  2.  DENIED in all other respects.

23

24  IT IS SO ORDERED.

25  Dated:   November 5, 2014                    _____

26                        SENIOR  DISTRICT  JUDGE

27

28

32